Victorina **PEREZ**, Personal Representative of the Estate of Nazario Perez, Plaintiff, Appellant,

v.

**STATE OF MAINE, et al.,** Defendants, Appellees.

No. 84–1583.

United States Court of Appeals, First Circuit.

Argued Feb. 7, 1985.

Decided April 23, 1985.

---

Mark Kierstead, Waterville, Me., with whom Samuel J. Humpert, Waterville, Me., and James Mitchell, Augusta, Me., were on brief for plaintiff, appellant.

Thomas D. Warren, Asst. Atty. Gen. with whom James E. Tierney, Atty. Gen., Augusta, Me., was on brief for defendants, appellees.

Robert E. Williams, Douglas S. McDowell, Kathryn Scully and McGuiness & Williams, Washington, D.C., on brief for Equal Opportunity Advisory Council, amicus curiae.

Before BREYER and TORRUELLA, Circuit Judges, and PETTINE,* Senior District Judge.

BREYER, Circuit Judge.

In 1976, the Maine Department of Manpower Affairs (DMA) decided not to hire Nazario Perez. Perez, believing DMA's decision reflected discrimination against Hispanics, complained to the appropriate state and federal administrative agencies. He also sued DMA in state court, alleging a violation of state antidiscrimination law, 5 M.R.S.A. §§ 4612(4)(A), 4613(1). In 1979, Perez and DMA entered into a settlement agreement. The Agreement referred explicitly to Perez's claims under *state* antidiscrimination law: Perez agreed to waive all claims against DMA "with respect to any alleged violations of the Maine Human Rights Act." The Agreement did not explicitly refer to any claims under *federal* antidiscrimination law. But, it used language that could be taken as settling the entire discrimination dispute, regardless of which particular statute granted Perez a legal right. It said:

> As evidence of its good faith in settling *this matter*, the Respondent [DMA] agrees to pay the Complainant [Perez] a sum of money in the amount of $20,000

as full and final settlement of *this matter*.

(Emphasis added.)

After signing the Agreement and receiving the money, Perez sued DMA again; but this time he sued in federal court alleging that the same facts made out a violation of federal antidiscrimination law, Title VII, 42 U.S.C. § 2000e et seq. The district court, in an initial opinion, wrote that the key issue in the case concerned the meaning of the quoted language in the settlement agreement. What was the Agreement supposed to settle—*all* antidiscrimination claims or just the *state* law claims? The court found the language ambiguous and set the matter for trial. At the trial a different district judge presided. He eventually found for DMA. 585 F.Supp. 1535. Victorina Perez (daughter of Nazario Perez, who had died in the interval) now appeals. We affirm the district court's decision.

At the outset appellant argues that the district court, seeing great similarity between state and federal laws, concluded from that fact alone that a settlement of a claim under the first must *necessarily* be a settlement of the second. She argues that such a holding would be wrong. And, we agree with her about that conclusion. We are aware of nothing in the statutes, in case law, or in logic that requires parties seeking to settle claims under two similar laws to settle both at the same time. Whether or not the laws in question are antidiscrimination statutes, the parties would seem free to agree to settle the one, or the other, or both. They would seem free to settle, or not, as they choose. *Del Rio v. Northern Blower Co.*, 574 F.2d 23, 26 (1st Cir.1978) (no duty to settle case or reduce claims). Of course, if, in settling, say, a state claim, the plaintiff receives substantially all that he might have received under the federal claim, his federal claim may effectively disappear, for there may be no more relief to which he is entitled. *See, e.g., Strozier v. General Motors Corp.*, 635 F.2d 424 (5th Cir.1981). But the

* Of the District of Rhode Island, sitting by designation.

parties concede that here Perez received significantly less from the settlement than a complete legal victory would have won him. Thus, the issue in this case is not whether Perez and the DMA were legally free to settle the federal claim; they were. Nor is it whether they *had* to settle the federal claim; they did not have to do so. The issue, as the first district judge pointed out, is what the parties agreed upon. What is the meaning of their agreement?

We, like both district judges, believe that the Agreement's language is ambiguous. The words "this matter," quoted above, might refer to the specific state law claim, or they might refer, more generally, to the underlying discrimination dispute between the parties. We therefore have reviewed the trial record to determine what these words meant in the context of the bargain made by the parties. *Monk v. Morton*, 139 Me. 291, 30 A.2d 17 (1943); *Restatement (Second) of Contracts*, § 5, comment a (1981).

The district court found that DMA thought these words referred to the entire dispute. And that finding has more than adequate support. For one thing, DMA paid $20,000 for the settlement; and it is difficult to see why it would have paid the money—80 percent of the monetary relief Perez sought in the complaint—unless it thought it was buying freedom from a second law suit. Appellant argues that DMA paid this amount because Perez's case was so strong that DMA virtually conceded 80 percent of it; but this logical possibility is not supported in any way in the record. For another thing, DMA's lawyer testified, without contradiction, that DMA intended to settle both state and federal claims. Finally, the absence of specific language in the Agreement about a federal suit, while arguably showing an intent to allow such a suit, is more plausibly explained by DMA's belief that the federal administrative agency would not typically issue a "right to sue" letter (a precondition for federal court action) once a discrimination claim had been settled.

The district court also found, however, that Perez did not want to settle the federal claim and did not intend the settlement agreement to do so. Unbeknownst to his lawyer or DMA, Perez had received a "right to sue" letter from the federal agency only nine days before signing the settlement. He then asked a second lawyer—not the lawyer representing him in negotiations—whether he could still bring the federal suit. And, the second lawyer told him he thought Perez still could do so. These facts, appellant argues, demonstrate that there was no "meeting of the minds," hence no contract barring suit.

Appellant is wrong, however, about the legal conclusion that follows from these facts. The law is clearly set forth in § 20(2)(b) of the *Restatement (Second) of Contracts* (1981), entitled "Effect of Misunderstanding." That section says

> The manifestations of the parties are operative in accordance with the meaning attached to them by one of the parties if
>
> . . .
>
> (b) that party has no reason to know of any different meaning attached by the other, and the other has reason to know the meaning attached by the first party.

This case fits squarely within the *Restatement*'s rule.

The previous discussion makes clear—as the district court found—that DMA attached to the words "this matter" the meaning "this entire discrimination controversy." Our examination of the record also makes clear to us that Perez had "reason to know the meaning attached" to those words by DMA. The size of the settlement and the lack of any good reason for DMA's settling only the state claim, at the least, put Perez on notice of what DMA intended the settlement to do. Perez's own attorney testified that her belief about what the words meant was the same as DMA's. Perez's refusal to tell even his own attorney about his receipt of a letter authorizing him to bring a federal suit—indeed his seeking legal advice about the federal claim elsewhere—makes clear that

DMA had no reason to know about Perez's interpretation, and it also suggests that Perez knew in fact what DMA was likely thinking. Perez's subjective intent, under these circumstances, is beside the point. In the absence of any evidence that Perez had good reason to believe DMA intended something else, the district court, in our view, had to conclude as a matter of law that the quoted *Restatement* rule fits this case. And, the settlement contract must then be interpreted as DMA meant it.

There is considerable discussion, in these briefs, of various cases concerning "waiver" of rights under federal antidiscrimination statutes. Those cases do not forbid settlement of claims like this one. *See, e.g., Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 52, 94 S.Ct. 1011, 1021, 39 L.Ed.2d 147 (1974) (an employee may waive Title VII claims in voluntary settlement); *Strozier v. General Motors Corp.,* 635 F.2d 424, 426 (5th Cir.1981) (voluntary settlement bars subsequent Title VII suit seeking identical remedy); *United States v. Allegheny-Ludlum Industries, Inc.,* 517 F.2d 826, 856–62 (5th Cir.1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976) (voluntary settlement of Title VII claims supported by public policy). Indeed, they speak favorably of settlements. This is a case in which plaintiff was represented by counsel. He received significant monetary compensation. As the district court repeatedly said, he entered the settlement contract voluntarily. We see no reason, under these circumstances, why, in this federal context, ordinary principles of contract law ought not to govern its interpretation.

The judgment of the district court is *Affirmed.*